UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 6649

INFORMATION BUILDERS, INC.,

    Plaintiff,

vs.

KNOWLEDGEBASE MARKETING, INC.,

    Defendant.

COMPLAINT



Plaintiff, by its attorneys, Labaton Sucharow LLP, for its Complaint herein, alleges:

1. Plaintiff, Information Builders, Inc. ("IBI"), is a New York corporation, with its principal place of business at 2 Penn Plaza, New York, NY.

2. Defendant, KnowledgeBase Marketing, Inc. ("KBM"), is a Delaware corporation with its principal place of business in Richardson, Texas. KBM is authorized to do business in the State of New York.

3. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Jurisdiction over this matter is founded upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

5. IBI is engaged in the licensing of computer software.

6. On or about August 6, 2008, IBI and KBM entered into a Master Software Licensing Agreement ("MSLA") and a Master Software License Agreement Subscription License ("Rider") annexed hereto as Exhibit A.

7. Paragraph 20.2 of the MSLA expressly provides for exclusive jurisdiction over any dispute "in a federal or state court located in the County, City and State of New York, and in no other forum, and the jurisdiction of such courts over such matters shall be exclusive."

8. Pursuant to paragraph 21.1 of the MSLA, New York law governs any dispute between the parties.

9. Pursuant to the Rider, IBI granted to KBM a Subscription License to certain software for a term of five years, commencing August 6, 2008 and ending August 5, 2013. The Rider expressly provides

> The Subscription Licensing is non-cancelable during the term specified below. Upon expiration of the initial term the Subscription License shall renew for an additional twelve (12) month period (unless a longer period is negotiated) at IBI's then prevailing rate. **(Emphasis added.)**
>
> The Licensee may cancel a renewal in writing within thirty (30) days from expiration of the Subscription License Term set forth herein.

10. The Rider further states:

> Action: WebFocus Reporting Software Package as detailed below via 5 year/60 month Non-Cancelable Subscription License at $60,000/yr. / $5,000/mo.
> \* \* \*
> Non-Cancelable Term: Effective 8/6/2008 through 8/5/2013.
> **(Emphasis added.)**

11. The license fee provided for in the Rider was substantially less than that charged by IBI for a shorter license term.

12. KBM is indebted to IBI for past due license fees in the sum of $6,043.58.

13. In addition, KBM has advised IBI that it will not honor its contractual obligation under the MSLA and Rider to pay fees through August 5, 2013.

14. The amount of such fees due through the end of the License Term amount to $129,265.65.

15. KBM's conduct represents an anticipatory repudiation of the contract, thereby rendering the full amount of future payments immediately due and payable.

16. As a result, IBI is entitled to Judgment against KBM for the sum of $6,043,58 representing past due payments and for the sum of $129,265.65, representing payments to become due for a total amount due of $135,309.23. Alternatively, IBI is entitled to a Judgment against KBM for the $6,043.58 past due and a declaration that KBM is obligated to pay all future License fees as they become due.

WHEREFORE, plaintiff demands Judgment against defendant:

(a) in the sum of $135,309.23;

(b) alternatively, in the sum of $6,043.58, and a declaration that defendant is required to make all future payments under the MSLA and Rider as they fall due; and

(c) for interest, costs, and disbursements.

Dated: September 19, 2011

Labaton Sucharow LLP
Attorneys For Plaintiff

By: _____
Joseph H. Einstein
JE-9872
140 Broadway
New York, NY 10005
212-907-0700

765143 v1
[9/19/2011 11:42]

- 3 -

# EXHIBIT A

**Information Builders**

**Master Software License Agreement**

Agreement No 620B.xx
Date 8/8/08

BETWEEN Knowledgebase Marketing (hereinafter "Licensee"), a Corporation of the State of ____ with principal offices at 2050 N Greenville, Richardson, TX 75082 and INFORMATION BUILDERS, INC. (hereinafter "IBI"), a New York Corporation with principal offices at Two Penn Plaza, New York, New York 10121-2898, U.S.A.

1. **Preamble**
   This Agreement sets forth the terms and conditions under which Licensee and its Affiliates, as defined below, may acquire License(s) to use IBI Software (this "Agreement"). An Affiliate may acquire a License hereunder solely by its execution of a separate Rider to this Agreement, at such time Affiliate becomes a "Licensee" pursuant to the terms and conditions contained herein. This Agreement grants to Licensee the non-exclusive, non-transferable right to use the specified Software in object code form only on the designated Computer.

2. **Effective Date**
   The effective date of this Agreement shall commence on the earlier of: (i) the date Licensee accepts delivery of the Software; or (ii) the date upon which the Agreement was executed by both parties.

3. **Definitions**
   3.1 "Affiliate" means an entity which is either: (a) at least fifty one percent (51%) owned by Licensee or; (b) controlled by Licensee by virtue of direct or indirect ownership of fifty one percent (51%) or more of its voting stock.
   3.2 "Computer" means the actual, designated computer that Licensee either owns or leases and operates, and upon which the Licensee is authorized to install the Software included in the applicable License, as set forth in the applicable Rider. The computer shall be designated in a Rider which shall identify the Computer by CPU Model Number, Serial Number, and Installation Location.
   3.3 "Concurrent User" means an individual Licensee employee, who has the right to access the Software on a licensed Computer simultaneously with a specified number of other Licensee employees.
   3.4 "Delivery Date" means the date by which the Software shall be delivered, as set forth in the applicable Rider.
   3.5 "Fee Schedule" means one or more schedules published by IBI from time to time which specify License Fees, InfoResponse Fees, Access Fees, Timesharing Fees and other charges made by IBI.
   3.6 "InfoResponse Fee" means the fee paid by Licensee, which entitles Licensee to annual enhancement, maintenance and support services.
   3.7 "Installation Location" means the actual location of the Computer upon which the Software is installed, as set forth in the applicable Rider.
   3.8 "License" means the right to use the Software hereby granted by IBI to Licensee.
   3.9 "License Fee" means the fee payable for the use of Software, as set forth in the applicable Rider and Fee Schedule.
   3.10 "Professional Services" means either: (a) education services; or (b) technical or consulting services designated separately on a Rider as a bundle of days and used either to assist Licensee with the installation and/or implementation of the Software, or to deliver a predefined packaged set of deliverables as described in an applicable Rider hereto. Either a separate mutually agreed to Consulting Agreement for consulting services, or a Technical Services Agreement for all other Professional Services is required whenever the Professional Services ordered includes a schedule of specified deliverables which are beyond the scope set forth in subparagraph 3.10(b) above. Notwithstanding the preceding sentence, all such Professional Services shall be covered by this Agreement until such time as the parties enter into such separate agreement. When a Consulting Agreement or Technical Services Agreement is entered into, it shall include a Work Order specifying the deliverables and such other terms and conditions the parties have mutually agreed to.
   3.11 "Rider" means a signed Rider to this Agreement, executed by both parties, which refers to and incorporates the general terms and conditions of this Agreement, designates the type of license being granted to Licensee (a "One-Time License," a "Rental License," or a "Trial License"), the Software being licensed, the Delivery Date, Computer, Installation Location, any Professional Services to be performed within the scope of Paragraph 3.10 and such other provisions as the parties deem appropriate and mutually agree to incorporate.
   3.12 "Software" means the specific software items being licensed.
   3.13 "Trial License" means a license of limited duration, during which time the Licensee may test IBI Software. Each Trial License shall be initiated by a fully executed Rider which shall incorporate the terms and conditions of this Agreement, designate the Software to be tested, the duration of the test period, the fees payable, the scheduled Delivery Date, Computer, Installation Location, and such other provisions as the parties deem appropriate and mutually agree to incorporate.
   3.14 "Upgrade" means an any change in a pricing parameter which applies to a license acquired hereunder as set forth in IBI's then current published fee schedule, such as: (a) an increase in the number of Users permitted, for in a User-based licenses; (b) and/or the Licensee's movement of the licensed Software from the licensed CPU to a higher tier CPU for CPU specific licenses; (c) an increase in the number of Images permitted, for an Image based licenses; and (d) an increase in the number of Instances permitted, for Connected Application licenses, as set forth in IBI's then current published fee schedule.
   3.15 "User" means a subscription user as further defined in Paragraph 11. If a License is priced based on a maximum number of Users the maximum number of such Users shall be stated on the applicable Rider. All User based licenses shall be subject to this definition, unless specifically designated a "Concurrent User" License.

4. **Implementation**
   4.1 Licensee and IBI shall enter into a Rider for Software licensed pursuant to this Agreement. Said Rider may include certain Professional Services as set forth in Paragraph 3.10.
   4.2 Each Rider executed by both parties pursuant to this Agreement shall be implemented by IBI or by IBI's authorized agent through delivery to Licensee of the Software specified in the Rider on or before the Delivery Date.
   4.3 IBI shall bear all risk of loss until delivery; and thereafter Licensee shall bear all risk of loss.
   4.4 Effective upon mutual execution of a Rider to this Agreement by the parties hereto, such Rider and this Agreement shall replace and supersede any prior licenses or agreements between the parties relating to the licensing of the Software. The provisions of the Rider and this Agreement thereafter shall govern and control.

5. **License and Permitted Use**
   5.1 Licensee hereby is granted a License to use the Software identified on the applicable Rider hereto, in object code form only, subject to the terms and conditions set forth in this Agreement. The Software shall be used by Licensee solely for its and its Affiliate's internal business purposes (i.e. no other third party commercial use of the Software is permitted) by its authorized personnel, only on designated Licensee owned or leased and operated Computer(s) located at designated Licensee owned or leased and operated Installation Location(s). The designated Computer and Installation Location for each Software License shall be identified in the applicable Rider.
   5.2 Licensee shall not copy or otherwise reproduce, or permit any third party to use, copy or otherwise reproduce, all or any part of the Software (including, without limitation, any user manuals) except as expressly authorized by Paragraph 5.5. Licensee further agrees not to use all or any part of the Software as part of any of the following type of operations: (a) service bureau; (b) network;(c) time share; (d) facilities management; (e) testing facility; (f) outsourcing; or (g) other operation of similar purposes as (a) through (f), whether or not for monetary or other consideration without IBI's express written consent and subject to any applicable IBI fees, terms and conditions.
   5.3 Licensee agrees that it shall not allow all or any part of the Software to be managed or supported by either: (a) a service bureau operation; (b) a time share operation; (c) an outsourcing company; (d) a facilities management company; or (e) any other third party, whether or not for monetary or other consideration, without IBI's express written consent. IBI's consent shall be conditioned upon the Licensee not being in breach of any of the provisions of this Agreement and shall be subject to Licensee's agreement to any additional applicable IBI fees, terms and conditions. Such additional fees, terms and conditions shall be set forth in applicable documents provided by IBI which the parties shall be required to execute. Such documents may include IBI's Third Party System Access Agreement; IBI's Timesharing Rider; or other applicable IBI documents. Such documents shall set forth any applicable IBI fees (such as License, Access Timeshare and Upgrade fees).
   5.4 Licensee agrees not to make alterations to or modify any Software; attempt to assign, transfer, grant sub-licenses, leases or other rights in or to any Software; or make any use of the Software, user manuals, or other documentation except as expressly authorized by this Agreement.
   5.5 Licensee is authorized to make and retain one copy of the Software in non-printed, machine-readable form, for back-up and disaster recovery purposes. Nothing in this Agreement shall be construed to prohibit Licensee from maintaining a reasonable number of archival copies of the Software. All proprietary notices, logos, copyright notices, and similar markings shall be retained on such copies.
   5.6 Except for the rights specifically granted herein, Licensee is granted no other rights in or to the Software delivered pursuant to each Rider. All rights to the Software (including all related manuals, educational and training materials), and including, but not limited to, intellectual property rights, trade secrets, patents, trademarks, and copyrights are and shall remain the sole and exclusive property of IBI.
   5.7 This License permits the Licensee and its employees to use the licensed Software on Licensee's designated Computer at Licensee's designated Installation Location as set forth in the applicable Rider hereto. Notwithstanding any other provision contained in this Agreement or Rider hereto, use of the Software on a computer which is operated by a third party regardless of who owns such computer and whether such computer is located at Licensee's site or at a third party's site, is strictly prohibited without IBI's express prior written consent, which shall be conditioned upon compliance with the provisions set forth above in Paragraph 5.3.

6. Term of License
6.1 Any License that is designated in the applicable Rider as a One-Time License shall be for a term of ninety-nine (99) years, commencing on the Delivery Date.
6.2 Any License that is designated in the applicable Rider as a Rental License shall be for an initial minimum non-cancelable term of one (1) year, commencing on the Delivery Date. Thereafter, the Rental License shall automatically renew for successive terms of one (1) year at the Rental License fee rate specified in the then current Fee Schedule. Licensee shall have the right to terminate a Rental License after the conclusion of the initial one (1) year term, by providing IBI at least thirty (30) days advance written notice.
6.3 Licensee shall have the right to convert a Rental License to a One-Time License at any time by providing IBI thirty (30) days written notice and by paying the One-Time License Fee specified in the then current Fee Schedule, less any credits granted by such Fee Schedule.
6.4 A Trial License shall be for the period set forth in the applicable Rider.

7. License Fees
7.1 The License Fee for a One-Time License shall be the single sum specified in the applicable Rider, which fee Licensee shall pay to IBI within thirty (30) days of the date of invoice.
7.2 The License Fee of any Rental License shall be the monthly fee specified in the applicable Rider for the initial term. Thereafter, the License Fee for a Rental License shall be the amount specified in the then current Fee Schedule. Payments of License Fees for Rental Licenses are due monthly in advance on the first day of each month.
7.3 The License Fee for a Trial License shall be the amount set forth in the applicable Rider. Upon conversion of a Trial License to a One-Time License or a Rental License, Licensee shall pay the fee set forth in the then current Fee Schedule, less any applicable credits.
7.4 After thirty (30) days, unpaid invoices are subject to a late payment charge of one and one half percent (1.5%) per month, or the highest legal rate, if less. Late payment charges shall also apply to any upgrade which is effective retroactively due to Licensee's breach of the notice requirements contained herein.

8. InfoResponse Annual Enhancement, Maintenance, and Support Service
8.0 Information Builders offers three (3) levels of annual support. Each level of annual support is described below.
8.1 InfoResponse Standard service is available only for FOCUS products it includes: (a) Telephone or other electronic support at IBI's central support headquarters during regular support hours (8 AM to 8 PM EST Monday through Friday, excluding national holidays), or from a local branch, if available; (b) and enhancements and updates to the licensed Software, which are designated as such by IBI.
8.2 InfoResponse Basic service is available for WebFOCUS and iWay products. FOCUS Licensees may upgrade to this service for an additional fee.
This service includes: (a) Telephone or other electronic support twenty four (24) hours a day seven (7) days a week via IBI's global support centers or from a local branch, if available; and (b) enhancements and updates to the licensed Software, which are designated as such by IBI. InfoResponse Basic service is mandatory for any new iWay or WebFOCUS Licenses which are acquired under the terms of this Agreement, or subsequently acquired hereunder. Licensee may upgrade any previously acquired license to InfoResponse Basic service by execution of a separate Rider or other approved ordering mechanism.
8.3 InfoResponse Premium service is IBI's highest level of support service. Licensees of any Information Builders products may upgrade to this optional service for an additional fee as set forth in a mutually executed Rider.
InfoResponse Premium service includes:
(a) all the features of InfoResponse Basic; (b) dedicated Account Support Manager to professionally manage and coordinate Licensee's support cases regarding IBI's products; (c) regularly scheduled conference calls; (d) priority queueing;
(e) plus any additional services described in the separate InfoResponse Premium Rider to be executed upon the purchase of this option. InfoResponse Premium service is an optional service for any IBI license.
8.4 Information Builders may offer other maintenance and support service packages during the life of this Agreement.
8.5 InfoResponse service is provided at the support level specified in the applicable Rider in accordance with the following: (a) In the case of a Trial or Rental License, for so long as the then applicable Trial or Rental License Fee is paid; (b) In the case of a One-Time License for periods of one year by payment of the applicable InfoResponse Fee as set forth in the then current Fee Schedule. The initial InfoResponse Fee is payable as set forth in the then current Fee Schedule; fees for InfoResponse service renewal will be billed automatically on each anniversary of the Delivery Date. All InfoResponse Fees are payable within thirty (30) days of receipt of invoice; (c) In the case of a Trial License, without cost for the duration thereof. The InfoResponse Fee shall be due upon conversion of the Trial License to a One-Time License as set forth in the then current Fee Schedule.
8.6 Features, software items, new products, or Software which are separately licensed by IBI are not included. InfoResponse service is available for the latest Software release made generally available by IBI to its customers and for the two (2) releases immediately preceding the latest available release.
8.7 InfoResponse Onsite services may be obtained from IBI as agreed to by the parties under the terms of separate Work Order(s) as described in Paragraph 19 below. All reasonable expenses incurred by IBI for InfoResponse Onsite services will be reimbursed to IBI by Licensee. InfoResponse Onsite services may include, but are not limited to, installation, implementation, tuning and configuration services and customized seminars.

8.8 IBI may terminate InfoResponse service in the event Licensee is in breach of any of the provisions of this Agreement and has failed to cure such breach within thirty (30) days from receipt of IBI's written notice of such breach.
8.9 In the event that InfoResponse service is suspended due to non-renewal on the Licensee's part, the Licensee may reinstate InfoResponse service by payment of the back InfoResponse Fees which would have accrued during the non covered period plus IBI's customary reinstatement surcharge.

9. Replacement Computers and Alternative Locations
9.1 The License granted pursuant to this Agreement is CPU and location specific. IBI shall grant to Licensee the right to replace the licensed CPU with another CPU which is owned/leased and operated by Licensee at a Licensee owned data center, providing the Licensee is not in breach of any of the provisions of this Agreement and the original License is current on either IBI's InfoResponse Fees (if a One-Time License) or Rental License fees (if a Rental License), in which case the Licensee may utilize the Software on a replacement computer within the same operating system in accordance with the following: (a) If the replacement computer is in the same or a lower price level as the original Computer as set forth in the then current Fee Schedule, IBI shall authorize Licensee to use the Software on such replacement computer on identical terms and free of any other conversion fee or service charge; and (b) if the computer replacing the Computer identified in the Rider is at a higher price level as set forth in the then current Fee Schedule, Licensee shall pay to IBI an additional fee based upon the difference between the License Fee paid for the original computer and the then current License Fee for the replacement Computer and any conversion charges as are stated in the then current Fee Schedule, less any applicable credits.
9.2 Licensee shall use reasonable efforts to advise IBI in writing of the use of the Software on a replacement computer thirty (30) days in advance of it coming into operation, but in no event later than thirty (30) days after such replacement comes into operation.
9.3 Licensee shall upon IBI's request, confirm in writing, on each anniversary of the Delivery Date, the make, model, serial number, and location of the computer on which the Software is currently installed and that no replacement computer is or has been in operation. Licensee shall permit representatives of IBI to inspect, on an annual basis, any location at which the Software is being used at reasonable times and on reasonable notice for the purpose of verifying that Licensee is not in default of this Agreement.
9.4 Installation of the Software on a different operating system is not permitted.
9.5 If Licensee fails to comply with its aforesaid reporting obligations, and the Software is installed on a replacement computer, and the then current Fee Schedule for the replacement computer provides for a higher price level than that provided for the Computer on which the Software was installed, then Licensee shall pay to IBI, retroactive to date of such installation, the fee described in Paragraph 9.1(b) plus interest at one and one half percent (1.5%) per month.
9.6 The parties shall enter into a Rider designating the replacement computer as the Computer authorized by this Agreement.
9.7 If a replacement Installation Location is in a different country, Licensee may be required to sign a new Rider or separate License Agreement with IBI (or its foreign representative) applicable to the country where the Software is installed. Such new Rider or License Agreement may be subject to different terms, fees, and discount rates.
9.8 If the affected License is a User based License then in addition to the above, the provisions of Paragraph 11 apply.

10. Additional Installations
10.1 Additional Software or Computers may be licensed hereunder by execution of a separate Rider, and payment of the applicable amount specified in the then current Fee Schedule.
10.2 All additional License Fees or InfoResponse Fees shall be based on the then current Fee Schedule for the country of installation; new installations may be eligible for the multiple installation discounts as specified therein.

11. Additional Users
This paragraph applies only to Licenses, which were priced based on the number of users in the Software configuration. In the event the Licensee desires to upgrade to a larger user license, an upgrade to the license and/or InfoResponse Fee shall apply in accordance with the applicable then current published Fee Schedule. Licensee shall use reasonable efforts to advise IBI of any increase in the number of permitted users thirty (30) days in advance of said additional users being given access to the Software, but in no event later than thirty (30) days after said additional users are given access to the Software. Licensee agrees to pay any applicable upgrade fees, retroactive to the date of such access. Unless otherwise noted on the applicable Rider, a "User" shall mean a specific individual employed by the Licensee who is authorized by the Licensee to use the Software, regardless of whether the individual is actively using the Software at any time. If the applicable Rider identifies the users as "Concurrent Users", then the maximum number of Concurrent Users shall be stated on the applicable Rider and upgrade fees shall apply if the Licensee exceeds the maximum number specified.

12. Image Licenses
Unless otherwise stated on the applicable Rider hereto, each Software item licensed hereunder shall be for a single "Image". If multiple "Images" are authorized, then the permitted number of "Images" shall be identified on the applicable Rider hereto. An "Image" is defined as a single instance or installation of the licensed Software, operating on an authorized Computer. In the event the

Licensee desires to run multiple "Images" of the licensed Software on the authorized Computer, by use of logical partitions or other means, then Licensee must acquire a License for each additional Image. Each additional Image shall be subject to the additional "Image" pricing set forth in IBI's then current published Fee Schedule. Licensee agrees to promptly notify IBI and acquire the appropriate License(s) in the event the number of permitted "Images" on the authorized Computer is exceeded.

## 13. Connected Application Licenses

Certain iWay Software items are priced based on the number of connections to an application software package such as SAP, or a transaction system such as CICS. Each connection is referred to as an "Instance", as further defined below. For example, if an iWay Adapter running with WebSphere on UNIX "connects" to 10 instances of SAP located throughout the Licensee's enterprise (10 different installed copies of SAP), then Licensee would need to license 10 "Instances" for the desired iWay Software. The number of permitted "Instances" which Licensee is granted the right to deploy shall be set forth on the applicable Rider(s) hereto. In the event the Licensee desires to connect to additional installations of the applicable application software, then Licensee must acquire a License for each additional "Instance" required. Licensee agrees to promptly notify IBI and acquire the appropriate License(s) in the event the number of permitted "Instances" is exceeded.

## 14. Warranties; Limitation of Liability

14.1 IBI warrants that the Software provided shall function substantially as described in the applicable user manual, as modified from time to time. The Warranty Period shall commence on the Delivery Date and shall continue for the period during which IBI makes available and Licensee subscribes to InfoResponse Service for the affected License. During such period the above warranty shall apply to enhancements, updates, and other items provided under InfoResponse Service.

14.2 IBI uses reasonable commercial efforts to protect all Software (and the media in which the Software is embedded) from computer viruses or other contaminants. IBI warrants that to the best of its knowledge the Software (and the media in which the Software is embedded) provided by it do not contain any viruses or programming codes or instructions that are constructed to damage, interfere with, or otherwise adversely affect the Software, data files, or hardware. Notwithstanding the foregoing IBI shall be permitted to include mechanisms in its Software which prevent illegal or unauthorized use providing such mechanisms do not prevent an authorized Licensee use of the Software as permitted herein.

14.3 IBI's sole obligation under the above warranties shall be to remedy or repair, as soon as reasonably practicable, all substantial and demonstrable errors and malfunctions in the Software. IBI may, in its sole discretion, provide either an update of the affected item, or an alternative method which has substantially the same functionality. For purposes of this Agreement, errors and malfunctions shall be considered to be "substantial" when they result in the impairment of one or more essential functions, features, or capabilities of the Software. IBI's aforementioned warranty obligation is conditioned upon: (a) Licensee giving IBI written notice of any substantial malfunction promptly and in any event within ninety (90) days after it has become apparent; (b) the said malfunction being repeatedly demonstrable; (c) the Software having been properly maintained; (d) the Software being at IBI's most current available release level or no more than two releases immediately preceding the most currently available release; and (e) no addition to or modification of the Software having been undertaken by Licensee or a third party whether or not said third party is acting on behalf of Licensee.

14.4 Licensee acknowledges and accepts that the role of IBI is solely that of a supplier of software and related items and that it is Licensee's responsibility to determine its own data processing requirements and to satisfy itself that the Software meets such requirements. Furthermore, Licensee recognizes it is responsible for the selection, use of, and results obtained from any Software or equipment used in conjunction therewith.

14.5 During the warranty period, IBI shall use reasonable commercial efforts to provide prompt and correct responses to telephone inquiries from Licensee. IBI shall take all steps reasonably required to correct any response which is not correct. IBI, however, shall have no liability for delays, errors, or omissions.

14.6 IBI warrants that any Professional Services it provides shall be performed by qualified personnel and will be of a professional quality conforming to generally accepted industry standards. If any Professional Services do not meet the warranty set forth above, Information Builders will use all commercially reasonable efforts, without charge, to bring its Professional Services to the specified level. In order to obtain such warranty service, the problem must be reported to Information Builders within 90 days of delivery of the Professional Services in question. In the event Information Builders cannot provide such Professional Services within a reasonable time after notification, Licensee's sole and exclusive remedy will be to receive a refund of any fees paid to Information Builders for the non-conforming Professional Services. This Paragraph 14.6 sets forth the exclusive warranty and remedy for any Professional Services provided under this Agreement.

14.7 EXCEPT AS SPECIFIED HEREIN, NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE MADE BY IBI.

14.8 IBI'S SOLE RESPONSIBILITY FOR BREACH OF WARRANTY, ERRORS, OR OMISSIONS SHALL BE AS SET FORTH IN THIS PARAGRAPH 14. IN NO EVENT WILL IBI BE LIABLE TO LICENSEE OR ANY OTHER PARTY FOR ANY REASON WHATSOEVER, WHETHER IN CONTRACT OR TORT, FOR ANY FORM OF PUNITIVE, INDIRECT, SPECIAL, CONSEQUENTIAL, OR INCIDENTAL LOSS, DAMAGE, OR EXPENSE (INCLUDING, BUT NOT LIMITED TO, LOSS DUE TO INABILITY TO OBTAIN DATA, LOSS OF BUSINESS, OR LOSS OF ANTICIPATED PROFITS) IN CONNECTION WITH OR ARISING OUT OF THE FURNISHING, FUNCTIONING, OR USE OF ANY SOFTWARE, PRODUCT, INFORESPONSE SERVICES OR PROFESSIONAL SERVICES PROVIDED UNDER THIS AGREEMENT OR ANY RIDER ENTERED INTO PURSUANT TO IT, EVEN IF IBI HAS BEEN ADVISED OF THE POSSIBILITY THEREOF.

14.9 IBI'S MAXIMUM LIABILITY FOR ANY DAMAGES, REGARDLESS OF FORM OF ACTION, SHALL IN NO EVENT EXCEED THE LICENSE FEES ACTUALLY PAID TO IBI FOR THE RELEVANT SOFTWARE GIVING RISE TO THE LIABILITY, PRORATED OVER A THREE YEAR TERM FROM THE INSTALLATION DATE OF THE APPLICABLE LICENSE, OR IN THE CASE OF PROFESSIONAL SERVICES THE AMOUNT OF FEES PAID FOR THE RELEVANT SERVICES GIVING RISE TO THE LIABILITY. IBI'S MAXIMUM LIABILITY FOR DAMAGES RELATED TO INFORESPONSE SERVICES SHALL BE LIMITED TO THE INFORESPONSE FEES ACTUALLY PAID TO IBI FOR THE RELEVANT INFORESPONSE SERVICES GIVING RISE TO THE LIABILITY FOR THE MOST RECENT ANNUAL TERM.

14.10 EACH PARTY INDEMNIFIES THE OTHER FROM LIABILITY FOR PERSONAL INJURY OR PROPERTY DAMAGE CAUSED BY THE OTHER PARTY'S NEGLIGENCE OR WILLFUL MISCONDUCT WHILE PERFORMING ITS OBLIGATIONS PURSUANT TO THIS AGREEMENT ON LICENSEE'S PREMISES.

## 15. Confidentiality and IBI Proprietary Rights

Licensee acquires no right in or to any IBI trademarks, copyrights, patents, trade secrets, or any other intellectual property rights belonging to IBI, or its licensors, by virtue of entering into this Agreement or any Rider including but not limited to those intellectual property rights associated with any data models or application products listed on the Rider or any other applicable order form. Licensee shall take all reasonable precautions to maintain the confidentiality of the Software and the intellectual property described above, which precautions shall be at least equivalent to those Licensee takes to protect its own confidential information of a similar nature. Without limiting the generality of the foregoing, Licensee acquires no rights in or to any source codes and shall not reverse engineer, disassemble, or take any other steps to discover such source codes. Licensee acknowledges that the licensed Software and documentation are deemed confidential and that Licensee will not make use of nor disclose the Software except as set forth in this Agreement. If Licensee discloses any confidential information to IBI during the course of IBI performing any Professional Services hereunder, then IBI shall take all reasonable precautions to maintain the confidentiality of such confidential information, which precautions shall be at least equivalent to those IBI takes to protect its own confidential information of a similar nature.

## 16. Change in Affiliate Status/Assignment

16.1 In the event an entity which was a qualified Affiliate loses such qualification as defined herein then the following shall apply: (i) IBI shall continue to permit said former Affiliate to license the IBI Software under this Agreement for a period of up to ninety (90) days; or (ii) if the Licensee was using the Software to process an Affiliate's data, IBI shall continue to permit Licensee to process the former Affiliate's data for a period of up to ninety (90) days; and (iii) by the conclusion of said ninety (90) day period, in the case of item (i) the former Affiliate must execute IBI's Master Software License Agreement or cease its use of the Software in accordance with Paragraph 17.4 below; in the case of item (ii) the Licensee must cease processing the former Affiliate's data, or must execute IBI's applicable Timesharing Rider to this Agreement, which shall contain the applicable fees terms, and conditions relating to such continued use. If an Affiliate was granted a discount based on its relationship with the Licensee, IBI shall be entitled to adjust such discount upon loss of Affiliate status.

16.2 This Agreement and each Rider may not be transferred or assigned in whole or in part even by operation of law, by Licensee or IBI without the prior written consent of the other, which consent shall not be unreasonably withheld. A spin-off, sale of assets, merger, acquisition, or other transaction which involves a change of control of Licensee shall be deemed to be an assignment hereunder. Licensee shall notify IBI of any such transaction within five (5) business days after its occurrence. Notwithstanding anything to the contrary contained herein IBI may: (a), assign this Agreement to an entity which acquires and continues its business; and/or (b) assign the right to receive any payments due from Licensee pursuant to this Agreement to a third party.

## 17. Default and Termination

17.1 IBI may terminate this Agreement and any License under it: (a) Effective immediately and without prior notice, if Licensee breaches the provisions of Paragraphs 5 or 15; (b) upon thirty (30) days written notice, if Licensee fails to pay any License Fee when due, but such termination shall not take effect, and the respective License shall remain in full force and effect, if Licensee makes such payment prior to the expiration of the notice period; or (c) upon thirty (30) days written notice if Licensee is in default of any other provision of this License, but such termination shall not take effect, and this License shall remain in full force and effect, if Licensee cures such default prior to the expiration of the notice period.

17.2 Maintenance shall automatically terminate if Licensee does not pay the applicable InfoResponse Fee when due with respect to any One-Time License or for a Rental License upon failure to renew it.

17.3 Termination shall be without prejudice to the right of IBI to retain any fees paid before termination, to demand payment of any fees, charges or reimbursable expenses that were due and unpaid at the effective date of termination, or to seek equitable relief, damages, or both for breach of any provision hereof.

17.4 If Licensee's right to use any Software terminates for any reason, whether with or without cause, or due to the expiration or non-renewal thereof, Licensee shall: (a) Immediately cease using such Software and delete same, and all associated items from its library; (b) contact IBI to secure a Software Return Authorization Number; (c) return to IBI all copies of materials associated therewith or which are a part thereof; (d) confirm in writing to IBI that such deletion and return has occurred in accordance with the Notices provisions herein.

18. Indemnification

18.1 IBI warrants that it owns the right to the Software licensed to Licensee and, subject to the remainder of this Paragraph 18, IBI agrees to defend or settle, at its option, any action brought against Licensee arising from any bona fide claim that Licensee's use of the Software which is the subject of any Rider under the terms of this Agreement infringes any patent, copyright, trademark, trade secret, or other proprietary right belonging to a third party ("Third Party Claim") and to hold Licensee harmless from any and all liabilities, losses, costs, damages, expenses, and reasonable attorney's fees that result from any such Third Party Claim.

18.2 IBI's obligations under this Paragraph 18 are conditioned upon: (a) IBI being promptly notified in writing by Licensee of any Third Party Claim; (b) Licensee giving IBI express sole authority to conduct the defense of any Third Party Claim and all negotiations of a settlement or compromise; (c) Licensee allowing its name to be used in proceedings as necessary; (d) Licensee providing IBI with all reasonable assistance in defending any Third Party Claim; and (e) the Third Party Claim shall not have arisen due to unauthorized acts or misconduct of Licensee or a third party, acting on behalf of Licensee.

18.3 If the Software which is the subject of any Rider becomes the subject of a Third Party Claim IBI may at its option and expense either: (a) Obtain an appropriate license for Licensee from the party asserting the Third Party Claim; (b) replace or modify the Software (or parts thereof) that is the subject of the Third Party Claim so that it is functionally equivalent and no longer infringing; (c) provide a non-infringing work-around; (d) refund to Licensee so much of the license fee as relates to the infringing Software items based on a straight line three (3) year depreciation schedule. Except for its indemnification obligations set forth above, IBI shall have no further liability to Licensee.

19. Professional Services

As per Paragraph 3.10 herein, certain Professional Services may be purchased along with a Software License acquired under a Rider hereto. Said Rider shall describe the services included and any applicable fees to be invoiced. Such fees plus reasonable out-of-pocket expenses shall be due on a net thirty (30) days basis. Licensee may obtain additional Professional Services from IBI as agreed to by the parties under the terms of individual Work Orders to IBI's separate Consulting, Education or Technical Services Agreement, respectively. Any consulting services provided under IBI's Consulting Agreement shall be billed on a time and materials basis unless the parties expressly agree otherwise in writing.

20. General

20.1 Law to be Applied
This Agreement and all Riders under it shall be governed by and interpreted under the laws of the State of New York, except its choice of law rules.

20.2 Forum
The parties agree that the making and performance of this Agreement constitutes the transaction of business in New York sufficient to give the federal and state court therein jurisdiction over both parties. Any action or proceeding involving, arising out of, or relating to this Agreement, or the making or breach thereof, shall be brought in a federal or state court located in the County, City, and State of New York, and in no other forum, and the jurisdiction of such courts over such matters shall be exclusive.

20.3 Taxes
All License Fees, InfoResponse Fees, and other charges referred to in this Agreement and payable under any Rider are net of any applicable sales, use, property, and other taxes and import or other duties, however designated or levied. Payment of all such taxes and duties (excluding taxes assessed upon the profit or gain of IBI), shall be the sole responsibility of Licensee.

20.4 Notices
Notices under this Agreement or any Rider shall be deemed given when sent postage prepaid by first class mail to the parties at the addresses specified below or such new address as they shall communicate to each other in writing from time to time.

To Licensee:
Knowledge Base Marketing
2050 N Greenville
Richardson, TX 75082

To IBI:
Information Builders, Inc.
Vice President and CFO
Two Penn Plaza
New York, New York 10121-2898, U.S.A.

20.5 Consent
Whenever IBI's consent is required under this Agreement, such consent shall rest on IBI's sole reasonable discretion.

20.6 Force Majeure
No party to this Agreement or any Rider under it shall be liable for delay or failure in the performance of its contractual obligations arising from any one or more events which are beyond its reasonable control. Upon such delay or failure affecting one party, that party shall notify the other party and use all reasonable endeavors to cure or alleviate the cause of such delay or failure with a view to resuming performance of its contractual obligations as soon as practicable.

20.7 Waiver
The failure of any party to enforce or exercise, at any time or for any period of time, any term of or any right arising pursuant to this Agreement or any Rider under it does not constitute, and shall not be construed as, a waiver of such term or right and shall in no way affect that party's right to later enforce or exercise it. The waiver by either party of the breach of any provision of this Agreement shall not constitute a waiver of the breach of any other provision, or of the subsequent breach of the same provision.

20.8 Severability
The invalidity or unenforceability of any term of or any right arising pursuant to this Agreement or any Rider shall in no way affect the remaining terms or rights

20.9 Binding Effect
This Agreement shall be binding upon and inure to the benefit of the parties, and their heirs, successors, and assigns.

20.10 Amendment
This Agreement may not be amended, waived, terminated, or superseded except by a written instrument signed by a duly authorized representative of Licensee and an officer of IBI.

20.11 Inconsistencies Between Agreement and Rider, and other Documents
Unless a Rider expressly provides otherwise, in the event of any inconsistency between the terms of this Agreement and any Rider, the terms of this Agreement shall govern and control. This Agreement and any Rider shall govern and control in the case of any inconsistency between it and any purchase order, confirmation, or other document issued by either party.

20.12 Plural and Singular Usage
As used herein, the singular of any term includes the plural and the plural means the singular, whenever the context so requires.

20.13 Headings
The section headings in this Agreement are inserted for convenience only and are not intended to affect the meaning or interpretation of this Agreement.

20.14 Entire Agreement
This Agreement contains the entire agreement by and between the parties and all discussions, negotiations, statements, advice as to functionality, representations and prior agreements are merged herein and shall not survive. It is expressly agreed that the terms of this Agreement and any Rider or Work Order shall supersede the terms in any Licensee purchase order or other ordering document.

---

Agreed to and accepted:

Information Builders, Inc.

Signature: [signature]
Name/Title: David Boyle, Vice President, Sales Operation
Date: AUG 28 2008

Knowledge Base Marketing
Licensee
Signature: [signature]
Name/Title: Brian Camp / SVP Infrastruct
Date: 8-8-8



MASTER SOFTWARE LICENSE AGREEMENT SUBSCRIPTION LICENSE

Agreement No: __620B.01__

Rider Date: __08/06/2008__

Rider to the Master Software License Agreement for IBI System Program Products dated 08/06/2008 between <u>KnowledgeBase Marketing</u> ("Licensee"), AND INFORMATION BUILDERS, INC., ("IBI" or "Licensor"), A New York Corporation with principal offices at 2 Penn Plaza, New York, NY 10121-2898.

IBI hereby grants to the Licensee a non-exclusive Subscription License to use the Operating System Version of the items listed below (the "Software"), on the computer and at the location specified during the subscription period specified. The Subscription License is non-cancelable during the term specified below. Upon expiration of the initial term the Subscription License shall renew for an additional twelve (12) month period (unless a longer subscription term is negotiated) at IBI's then prevailing rate. The Licensee may cancel a renewal in writing within thirty (30) days from the expiration of the Subscription License Term set forth herein. The Subscription License Fee is subject to adjustment if a licensing parameter set forth below is exceeded (for example a hardware upgrade, or increase in number of permitted Users).

**Web Browser.** Notwithstanding anything to the contrary in the MLA, the parties acknowledge that applications written by Licensee utilizing IBI's WebFOCUS Software may be accessed by Licensee's employees, customers, or contractors via a web browser at no additional charge as long as such access is in furtherance of Licensee's internal business purposes and as further detailed below. Such use does not constitute a breach of this agreement providing the WebFOCUS software is installed only on duly authorized and licensed Licensee CPU's and provided that any third party access shall be limited to read only use, for the benefit of Licensee's business and provided that said third parties shall not be permitted to develop applications of its own, or for other third parties.

CPU: (1) IBM Z9 Business Class 2096-U03  
CPU: (1) Wintel 2/processor

Serial No: _____  
Serial No: _____

Subscription License Start Date: 08/06/2008

Subscription License Term: 5 Year / 60 Months

Subscription License Fee: $60,000/Yr / $5,000/Mo

Operating System: IBM Z/OS 1.7 & Intel

Installation Location: 5884 Point West Dr  
Houston, Texas 77036-2612

Delivery Method (Circle One): Download / **Ship**

**Action:** License WebFOCUS Reporting Software Package as detailed below via 5 Year/60 Month Non-Cancelable Subscription license at $60,000/Yr / $5,000/mo.  
**Non-Cancelable Term:** Effective 8/6/2008 through 8/5/2013  
**Payments:** 60 Incremental Payments of $5,000/month due on the 6th day of each month, starting 8/6/2008.

| Licensed Item | Number of Users permitted | Number of Images permitted | Number of Instances permitted |
|---|---|---|---|
| Mainframe - WebFOCUS Reporting Package for 50 Subscribed/Unique Named Users Includes: WebFOCUS Reporting Server, WebFOCUS Active Reports, WebFOCUS Comprehensive User Services, plus iWay adapter for VSAM Sequential files | 50 Subscribed / Unique Named Users | 1 | 1 |
| 080 WebFOCUS Developer Studio | 5 Subscribed/Unique Named Users | NA | NA |
| Wintel - IODC iWay ODBC Connector | NA | 1 | 1 |

"Users", "Images" and "Instances" are as defined in the Agreement and/or IBI's Fee Schedule

Subscription Fee includes InfoResponse Basic Maintenance.
Subscription Fee includes 2 environments: 1 Production and 1 Non-Production.

*Licensee commits to provide Licensor a mutually agreeable press release within 30 days of contract execution.*
*\*\* Addition of Report Caster will increase monthly fee by $1,490.18. Price is valid for 90 days after Rider execution date.*

Accepted: Information Builders, Inc.

By _____
Authorized signature David Boyle
Vice President,
Type name/title  Sales Operation

Date  AUG 28 2008

Licensee: KnowledgeBase Marketing

By _____
Authorized signature
Brian Camp / SVP Infrastructure
Type name/title
8-8-8

Date

2/2